# EXHIBIT 1

# STATE OF MICHIGAN
## CIRCUIT COURT FOR THE 30th JUDICIAL CIRCUIT
### INGHAM COUNTY

DANA NESSEL, Attorney General
of the State of Michigan on behalf of
the People of the State of Michigan
and the Michigan Gaming Control Board,

     *Plaintiff,*

v.

KALSHIEX LLC,
a Delaware corporation based in New York,

     *Defendant.*

Case No. 26-**1087**_____-CZ

Honorable    **JUDGE ROSEMARIE E. AQUILINA**



---

## COMPLAINT FOR PERMANENT INJUNCTION
## AND TO ABATE NUISANCE

---

Felepe H. Hall (P59533)
Jason A. Geissler (P69322)
Lauren Fitzsimons (P82997)
Assistant Attorneys General
Attorneys for Plaintiff
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210

Dated: March 3, 2026

546372

## PRELIMINARY STATEMENT

1.    Michigan Attorney General Dana Nessel, on behalf of the People of the State of Michigan, and in collaboration with the Michigan Gaming Control Board, brings this lawsuit pursuant to the Lawful Sports Betting Act (hereafter LSBA), MCL 432.409(2), seeking an order of abatement and permanent injunctive relief as well as costs and fines prescribed by state statutes against KalshiEx LLC.

2.    Defendant KalshiEX LLC (hereafter Kalshi) is a Delaware limited liability company with its principal place of business in New York, New York. Kalshi is a wholly owned subsidiary of Kalshi Inc.  Kalshi offers an online sports betting operation to residents in the State of Michigan without the licensing approval of the Michigan Gaming Control Board.  Specifically, Kalshi operates a so-called prediction market through which residents of the State of Michigan can engage in unlicensed gambling under the guise of trading event contracts.  This market is an online trading platform through which users may wager on the likelihood of a sports-related occurrence.  Kalshi conducts business across the United States, including within Michigan, where Kalshi makes its services available to residents, markets its platform to potential users, and accepts payments through widely used financial systems accessible by Michigan consumers.

3.    These practices violate Michigan's prohibitions against gambling as well as several provisions of LSBA.

4. The Michigan.Gaming Control Board, in partnership with the Department of Attorney General, has dedicated many resources to enforcing Michigan's gaming laws.

5. Entities like Kalshi continue to circumvent the gaming prohibitions imposed by the Penal Code and LSBA and, in so doing, threaten the health, safety, and welfare of Michigan citizens.

6. This lawsuit is required to reinforce Michigan's plenary authority over internet sports betting within its borders as well as to protect the health, safety, and welfare of its citizens.

**PARTIES**

7. Attorney General Dana Nessel brings this suit in her official capacity on behalf of the People of the State of Michigan and the Michigan Gaming Control Board (hereafter MGCB), a state agency which, subject to statutory limitations, exercises complete control of internet sports betting within Michigan. See Mich. Comp. Laws § 432.409(1).

8. Defendant Kalshi is a Delaware limited liability company with its principal place of business located at 594 Broadway, Suite 407, New York, New York, 10012. Kalshi is a wholly owned subsidiary of Kalshi Inc.

**JURISDICTION**

9. This Court has jurisdiction over this matter under MCL 14.29 because Defendant offers an online sports betting operation to residents in the State of

3

Michigan without the licensing approval of the Michigan Gaming Control Board. MCL 432.413(5).

10. The Attorney General is also authorized to bring this action on behalf of the MGCB under LSBA and common law. MCL 432.409(2); *Attorney General v. PowerPick Players' Club of Michigan, LLC*, 287 Mich App 13, 44 (2010).

## VENUE

11. This action is brought by the Attorney General in the name of the state and the people of the state. Accordingly, this Court is an appropriate venue under MCL 14.102.

## BACKGROUND

12. With assistance from the Department of Attorney General, the MGCB has made increased efforts to identify and halt illegal internet sports betting operations in Michigan.

13. Those efforts have focused on businesses offering illegal gambling via unauthorized internet sports betting.

14. The MGCB's ability to combat illegal internet sports betting was enhanced with the Michigan Legislature's enactment of LSBA in December of 2019.

15. In enacting LSBA, the Legislature noted that "[o]perating, conducting, and offering for play sports betting on the internet, including through mobile application, involves gaming activity that already occurs in this state illegally." MCL 432.402(a).

4

16. The Legislature further declared that "[i]n order to protect residents of this state who wager on sports through the internet, including through mobile application, and to capture revenues generated from such sports betting, it is in the best interest of this state and its citizens to regulate this activity establishing a secure, responsible, fair, and legal system of internet sports gaming." MCL 432.402(d).

17. LSBA provides that "[i]nternet sports betting may be conducted only to the extent that it is conducted in accordance with this act." MCL 432.404(1).

18. Under LSBA, the term "internet" is defined as "the international computer network of interoperable packet-switched data networks, inclusive of such additional technological platforms as mobile, satellite, and other electronic distribution channels." MCL 432.403(r).

19. "Mobile application" is defined as "an application on a mobile phone or other device through which an individual is able to place an internet sports betting wager. MCL 432.403(x).

20. "Sports betting" means to operate, conduct, or offer for play wagering conducted under this act on athletic events and other events approved by the board. Sports betting includes, but is not limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in-game betting, proposition bets, and straight bets. Sports betting does not include a fantasy contest." MCL 432.403(bb).

21.    "Internet sports betting" is defined as "operating, conducting, or offering for play sports betting through the internet." MCL 432.403(s).

22.    Internet sports betting may only be offered by a licensed sports betting operator. MCL 432.404(7).

23.    Only casinos that are currently licensed under the Michigan Gaming Control and Revenue Act, MCL 432.201 *et seq.* (hereafter Gaming Act), and federally authorized Tribal casinos within this state can apply for a sports betting operator license. MCL 432.406(1)(a), (b).

24.    A licensed sports betting operator may utilize an internet sports betting platform, which is defined as an integrated system of hardware, software, applications, including mobile applications and servers through which a sports betting operator operates, conducts, or offers sports betting through the internet. See MCL 432.403(u), (v) and MCL 432.404(7).

25.    The internet sports betting platform provider is also required to be licensed by the MGCB. MCL 432.403(ee).

26.    LSBA vests the MGCB with the authority to regulate sports betting. MCL 432.405(1).

27.    The MGCB "has jurisdiction over every person licensed by the board and may take enforcement action against a person that is not licensed by the board that offers internet sports betting under this act." MCL 432.405(2).

28.    Additionally, the MGCB has "all other powers necessary to enable it to fully and effectively execute this act to administer, regulate, and enforce internet sports betting under this act."  MCL 432.405(1).

29.    Included in the MGCB's authority is the ability to investigate and "issue cease and desist orders and obtain injunctive relief against a person that is not licensed by the board that offers internet sports betting in this state." MCL 432.409(2).

## FACTS

30.    Kalshi is a New York based company that is neither a casino currently licensed under the Gaming Act nor a federally authorized Tribal casino within this state.

31.    Because Kalshi is not a licensed Michigan casino or a federally authorized Tribal casino, it cannot apply for an internet sports betting operator license.  MCL 432.406(1)(a), (b).

32.    Additionally, Kalshi does not currently possess, nor has it applied for, a license to be an internet sports betting platform provider.  MCL 432.403(ee).

33.    Accordingly, Kalshi is prohibited from offering internet sports betting in the State of Michigan.

### Kalshi's Sport Betting Platform

34.    Kalshi was co-founded in 2018 by Tarek Mansour and Luana Lopes Lara.

35. Kalshi formally launched its platform in July 2021 with event contracts focused on topics like inflation, Consumer Price Index, unemployment, and macroeconomic benchmarks. These initial offerings were framed in financial terms but structured and priced like bets. Each contract allowed users to take a position for or against a particular outcome for a fixed return.

36. In October 2024, Kalshi expanded into political event contracts. Users were invited to bet on which party would control Congress, whether a presidential candidate would win a swing state, or the margin of victory in a presidential race. These political contracts were presented as opportunities to profit from "civic knowledge," but their mechanics (binary outcomes, fixed payouts, speculative pricing) are the same as those that comprise its sporting event contracts.

37. Kalshi is a private technology company that, in its own words, operates a web-based "prediction" market.

38. From its inception, Kalshi has promoted itself as a novel "financial exchange" through which people could "trade in the domain of every day."[1]

39. In reality, Kalshi was designed from the outset to appeal to mass-market speculation.

40. Kalshi allows Michigan consumers to place bets on its platform through its website, https://kalshi.com, and through its mobile application ("app") on the Android and iOS (Apple) platforms.

41. Kalshi allows users to take a monetary position on a real-world event by purchasing "event contracts."

8

42. Event contracts are structured as binary options: bettors buy "Yes" or "No" positions on whether an event will occur ("Yes") or will not occur ("No"). They receive a fixed payout if they are correct, and nothing if they are not.

43. Kalshi describes itself as a prediction market because each contract's price (ranging from $0.01 to $0.99) is determined based on the total volume of "Yes" and "No" wagers purchased, reflecting "the collective sentiment of its users regarding the likelihood of an event . . . ."[2].

44. Kalshi claims this "dynamic pricing model" "directly correlates with the market's perceived probability of a specific event occurring," which provides for "real-time fluctuations in contract prices, ensuring that they accurately reflect the consensus opinion of the market participants."[3]

45. As the perceived likelihood of a "Yes" outcome increases (i.e. more people have purchased the "Yes" option in an event contract), the corresponding "Yes" contract price increases. Conversely, the contract price for "No" will increase as the perceived likelihood of a "No" outcome increases, and the contract price for "Yes" will fall.

47. Once the event is resolved, Kalshi settles contracts at $1 for the correct outcome and $0 for the incorrect one.

48. For example, wagering on 100 "Yes" event contracts for a certain event to take place at a cost of 30 cents each ($30 total)—plus any applicable transaction

---

[1] About Kalshi, KALSHI, https://kalshi.com/about.
[2] How are prices determined?, KALSHI HELP CTR., https://help.kalshi.com/markets/markets-101/how-are-prices-determined How are prices determined? | Kalshi Help Center.
[3] *Id.*

fee— would result in a payout of $1 per contract, or $100 (netting $70) if correct. If incorrect, the original $30 is lost.

49.     For most wagers, Kalshi charges a varying transaction fee, charging more for the most uncertain events.  That is, $0.50 wagers have the greatest fees, amounting to approximately 1.75 cents per contract.[4]

50.     Bettors deposit funds into their Kalshi account and use those funds to wager on event contracts.  Any return on a successful wager will remain in the bettor's Kalshi account until they choose to withdraw.  Kalshi charges a fee for certain deposit and withdrawal methods.

51.     Kalshi matches bettors on opposite sides of the event contract (the "yes" and the "no") so that the combined investment from both bettors equals $1.

52.     If the price changes, bettors may "sell" their wager before the event takes place.

53.     Kalshi's affiliated entity, Kalshi Trading LLC, fills a role similar to that of the house in a classic gambling operation, by acting as a market maker on its platform.  It supplies liquidity by placing both buy and sell orders for event contracts, ensuring that bettors can wager at nearly all times.  It takes opposing positions, absorbs imbalances in bettor demand, and profits from price movements. For example, suppose Kalshi offers a contract asking, "Will the Detroit Tigers win their game on Friday?"  A bettor might want to wager on 100 "Yes" shares at 65 cents each, expecting the Tigers to win.  But if there are not enough other bettors

_____

[4] Kalshi Fee Schedule, KALSHI, https://kalshi.com/docs/kalshi-fee-schedule.pdf.

willing to sell "No" shares at that price, Kalshi Trading steps in and buys the "No" shares.

54.    Kalshi also has an affiliated clearinghouse under common ownership called Kalshi Klear LLC that finalizes and settles event contract wagers. Kalshi Klear is responsible for determining outcomes, issuing payouts, and processing the movement of funds between bettors once an event is resolved. It functions entirely within Kalshi's corporate structure and does not serve as an independent intermediary. This arrangement allows Kalshi to control each stage of the wager. Kalshi writes the rules for the contract, determines the basis for settlement, and oversees the payment process.

55.    Kalshi's use of its own clearing agent reveals that the company is not merely providing a platform for third-party trading. It is administering a closed loop wagering system, where it creates the games, handles the bets, and pays out the winners.

56.    The types of event contract wagers are numerous, and Kalshi keeps adding more. Examples include who will win the game between the Belleville Senators and the Syracuse Crunch in the American Hockey League, who will win the game between the Frolunda HC and the Lulea Hockey in the Swedish Hockey League, whether Patrick Reed will have a better score than Daniel Hillier during the DP World Tour Qatar Masters, whether the Detroit Pistons and the Washington Wizards will combine for more than 224.5 points, and whether Rider University will win by more than 9.5 points in its college basketball game against Marist

University. Kalshi's expanded offerings include bets on events such as the number of touchdowns a given player will score in a game, how many points a certain team will win by, the overall total score in a game, and bets on combinations of different sports outcomes. In each case, the bettors' return is determined entirely by an outcome outside their control.

### Kalshi's Platform Emulates a Gambling Platform

57. From the start, Kalshi's offerings have mirrored a digital gambling experience.

58. Kalshi's platform employs behavioral design mechanisms drawn from gambling psychology, including features that encourage impulsive engagement, exploit award anticipation, and diminish users' perception of financial risk.

59. For example, potential payouts are presented in bright green font, a color that signals safety and correctness, to emphasize the attention to the profits. In contrast, cost and odds appear in standard black text, diminishing their visual prominence. Moreover, Kalshi only represents the potential outcome upon the purchase of $100 worth of a "Yes" or "No" contract. This interface design subtly encourages high-risk transactions by emphasizing reward while obscuring risk.

60. Kalshi also offers a continuously updating ticker tape of market activity and a "people are also buying" on the event contract wager page before placing a wager in addition to a "people also bought" prompt immediately after users place a wager, sustaining real-time stimulation and encouraging further speculation without pause. These features mirror known psychological triggers of

12

gambling behavior and are engineered to increase user retention and transaction volume.

61.    User profiles add another layer to Kalshi's encouragement of engagement and speculation. Bettors may create a profile with a nickname, profile picture, and description to "interact with other traders."[5] These profiles may publicly display detailed wagering metrics, including potential payouts, cumulative profit, total volume transacted, and the number of wagers made, depending on the user's privacy setting.  Making these features public allows the bettor to compete on the leaderboard.  If made public, these figures appear prominently beneath each bettor's profile name and avatar, alongside a timeline of their recent transactions and posts, replies, and "likes" (i.e. their interactions with other Kalshi users) on the Kalshi platform.

62.    Bettors are encouraged to post their "prediction" on the event contract page under the "Ideas" tab, which facilitates a messaging function for bettors to engage with each other.  Bettors can reply, like, bookmark, and share other user's posts.

63.    User profiles serve as performance dashboards that encourage bettors to compete, compare, and signal success.  The interface reinforces speculative behavior through design choices modeled on gambling platforms, including rapid trade cycling, reward anticipation, and mechanisms known to trigger compulsive engagement loops.

---

[5] Kalshi Ideas Profile, KALSHI HELP CTR., https://help.kalshi.com/account/kalshi-ideas-profile.

13

64.    This uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior. Behavioral researchers warn that such mechanisms, modeled after operant conditioning and slot machine dynamics, can bypass rational evaluation and contribute to excessive financial risk-taking.

## MICHIGAN GAMBLING PROHIBITION

65.    Michigan law contains a general prohibition against gambling that makes it illegal to accept money, directly or indirectly, with the understanding that money will be paid "contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain." MCL 750.301.

66.    Based on this statutory language, Michigan courts have defined gambling as a scheme that includes the elements of chance, prize and consideration. *F.A.C.E. Trading, Inc. v Dept of Consumer & Indus. Servs.*, 270 Mich App 653, 667-668 (2006).

67.    By virtue of offering its internet sports betting operation to Michigan residents, Kalshi represents either actively, or by omission, that its internet sports better operation has the approval of the State of Michigan and is legal.

68.    By virtue of offering its internet sports betting operation to Michigan residents, Kalshi induces a person to reasonably believe that its internet sports betting operation is legal in the State of Michigan when in fact such conduct is illegal.

14

69.    Despite calling its product "event contracts," consumers are placing wagers on the outcome of sporting events.

70.    Kalshi's sporting event contracts constitute "sports betting" because Kalshi is engaged in offering wagering on athletic events including, but not limited to "single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in-game betting, proposition bets, and straight bets."  MCL 432.403(bb).

71.    Kalshi's offering meets the definition of an "internet sports betting wager" because the price of the contract is the cash or cash equivalent that the user risked on sports betting through Kalshi's platform.  MCL 432.403(w).

72.    In August 2025 and September of 2025, Kalshi expanded its sports-contract offerings by launching new wager types that also resemble other wagers explicitly defined as "sports betting."

73.    One of the wager types is framed as follows: "[w]ill win by points?"[6] This is a point spread bet, which is a bet on the difference in score between teams in a game.  In fact, Kalshi titled the contract "FOOTBALLSPREAD."[7]
MCL 432.403(bb)

74.    Another wager type asks "[w]ill have points in of ?"[8] This is an "over/under" wager, which is a bet on whether the total amount of points scored in a

---

[6] Exhibit 1 - Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC at 1 (Aug. 18, 2025) (regarding "KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the 'Will win by points' Contract").
[7] *Id.* at 8.
[8] Exhibit 2 - Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC at 1 (Aug. 18, 2025) (regarding "KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the 'Will have points in of ?' Contract").

game is over or under a specific amount. Over/under bets are explicitly included in the definition of sports betting. MCL 432.403(bb).

75.    A third wager type asks the bettor "[w]ill score touchdown(s) in of ?"[9] This structure resembles a proposition bet, which are bets on specific events that are not the outcome of a game. Proposition bets are explicitly included in the definition of sports betting. MCL 432.403(bb).

76.    Accordingly, Kalshi's sport events contracts are wagers on uncertain outcomes, structured and operated in a manner that meets the legal definition of an internet sports betting wager under Michigan law. MCL 432.403(w).

77.    Kalshi's unlawful internet sports betting operation violates Section 13(1)(a) of LSBA because Defendant is conducting a sports betting operation where wagering is conducted over the internet without a license issued by the MGCB. MCL 432.413(1)(a).

78.    Kalshi's unlawful internet sports betting operation violates Section 18(1)(a) of the Gaming Act because Defendant is conducting a gambling operation without a license issued by the MGCB. MCL 432.218(1)(a).

79.    Kalshi's unlawful internet sports betting operation violates Section 301 of the Penal Code because it is accepting money with the understanding that money or something of value will be paid contingent upon the happening of an event unknown to the parties. MCL 750.301.

---

[9] Exhibit 3 - Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC at 1 (Aug. 18, 2025) (regarding "KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the 'Will score touchdown(s) in of ?' Contract").

80.     Kalshi's unlawful internet sports betting operation violates Section 305 of the Penal Code because Defendant publishes, advertises, delivers or distributes to the public, statements or information concerning the making or laying of wagers or bets on the outcome of any game or contest or on the happening of any event not known by the parties to be certain.  MCL 750.305.

81.     A violation of any one of the above-cited statutory sections constitutes a nuisance.  See *Attorney General. ex rel. Michigan Board of Optometry v Peterson*, 381 Mich 445, 465 (1969).  *See also PowerPick*, 287 Mich App at 44.

## KALSHI'S UNLICENSED SPORTS EVENT CONTRACTS UNDERMINE MICHIGAN'S EFFORTS TO PROTECT ITS RESIDENTS FROM THE HARMS OF ONLINE SPORTS WAGERING

82.     Gambling has serious public health risks that may lead to harm to a gambler's financial, economic, emotional, and physical well-being, as well as the well-being of their families and communities.

83.     The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM 5-TR") categorizes gambling disorder as an "addictive disorder," making it the only defined behavioral addiction in that manual.  The disorder includes symptoms such as an increased tolerance for gambling (*i.e.*, more money wagered over time); repeated unsuccessful efforts to control, reduce, or stop gambling; and lying or concealing the extent of gambling involvement.

84.     A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling

17

problems among sports bettors is at least twice as high as among gamblers in general. . . . [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems."[10]

85.    "[N]ot only does sports betting lead to increased betting activity, but it also leads to higher credit card balances, reduced available credit, decreased net investments in financial markets, and greater participation in lottery play.  These effects are particularly pronounced among financially constrained households."[11]

86.    Research further shows that "legalized sports betting amplifies emotional cues, as evidenced by increased [intimate partner violence] when a fan's home team unexpectedly loses."[12]

87.    Several US studies report that those with gambling disorder had the highest suicide rate of any addiction disorder, with one in five having attempted suicide.

---

[10] *A Review of Sports Wagering & Gambling Addiction Studies Executive Summary*, NAT'L COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/wpcontent/uploads/2023/09/Sportsgambling_NCPGLitRvwExecSummary.pdf.

[11] Scott R. Baker et al., *Gambling Away Stability: Sports Betting's Impact on Vulnerable Households*, Oct. 21, 2024, https://mitsloan.mit.edu/sites/default/files/inlinefiles/Session3_Paper3_Gambling%20Away%20Stability.pdf.

[12] Kyutaro Matsuzawa & Emily Arnesen, *Sports Betting Legalization Amplifies Emotional Cues & Intimate Partner Violence* (Oct. 30, 2024) available at https://ssrn.com/abstract=4938642 or http://dx.doi.org/10.2139/ssrn.4938642.

18

88.    In addition, experts suggest that the pressures that sports betting puts on college athletes may be a contributing factor to the rise in suicidality for this group.

89.    Kalshi is facilitating gambling in Michigan without all the required responsible gambling features mandated for licensed internet sports betting, and without any oversight by the MGCB as to whether its measures are effective, which is exposing residents of Michigan to gambling addiction with few safeguards.

## COUNT 1
## LSBA VIOLATION

90.    Plaintiff incorporates by reference paragraphs 1-89 above as if fully stated herein.

91.    In Michigan, with the exception of express statutory exclusions, internet sports betting may only be conducted under LSBA.  MCL 432.401 *et seq.*

92.    Internet sports betting may only be offered by a licensed internet sports betting operator.  MCL 432.404(7).

93.    Only casinos that are currently licensed under the Gaming Act and federally authorized Tribal casinos within this state can apply for a sports betting operator license.  MCL 432.406(1)(a), (b).

94.    Under LSBA, only a sports betting operator or its internet sports betting platform providers may process, accept, or solicit internet sports betting wagers.  See MCL 432.404(7).

19

95. Kalshi cannot qualify for a sports betting operator license because it is not a licensed Michigan casino or a federally authorized Tribal casino. MCL 432.406(1)(a), (b).

96. Kalshi does not currently possess, nor has it applied for a sports betting supplier license to be an internet sports betting platform provider. MCL 432.303(ee).

97. In offering its internet gambling operation to Michigan residents, Kalshi has, and continues to violate LSBA.

98. LSBA authorizes injunctive relief against a corporation that offers internet gaming without a license. MCL 432.409(2).

## COUNT 2
## COMMON LAW NUISANCE

99. Plaintiff incorporates by reference paragraphs 1-98 above as if fully stated herein.

100. "At common law, acts in violation of law constitute a public nuisance. Harm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare." *Attorney General. ex rel. Michigan Board of Optometry v Peterson*, 381 Mich 445, 465 (1969). *See also PowerPick*, 287 Mich App at 44.

101. Kalshi's unlawful internet sports betting operation violates multiple statutory sections of LSBA, the Gaming Act and the Penal Code, including, but not limited to:

- MCL 432.413(1)(a)

- MCL 432.218(1)(a)

- MCL 750.301

- MCL 750.304

- MCL 750.305

- MCL 750.307

102.    Kalshi's unlawful internet sports betting operation constitutes a public nuisance under common law.

## CONCLUSION & RELIEF SOUGHT

The above-captioned Defendant is operating an unlawful internet sports betting operation in violation of LSBA and the Michigan Penal Code.  This unlawful internet sports betting operation is also a public nuisance at common law.

WHEREFORE, on behalf of the People of Michigan and the MGCB, Attorney General Dana Nessel respectfully requests the following relief:

a.    An Order declaring Kalshi's internet sports betting operation a common law nuisance;

b.    Issuance of a permanent injunction and order of abatement enjoining and restraining Kalshi, as well as its officers, employees, agents, successors, and anyone acting on their behalf, from engaging in or advertising Kalshi's internet sports betting operation;

21

c. Such other relief this Court deems fair and equitable.

Respectfully Submitted,

Felepe H. Hall (P59533)
Jason A. Geissler (P69322)
Lauren Fitzsimons (P82997)
Assistant Attorneys General
Attorneys for Plaintiff
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210

Dated: March 3, 2026

22