UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

DANA NESSEL, Attorney General of the
State of Michigan on behalf of the People
of the State of Michigan and the Michigan
Gaming Control Board,

No. 1:26-cv-00731

HON. PAUL L. MALONEY

Plaintiff,

v.

MAG. PHILLIP J. GREEN

KALSHIEX LLC,

**BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION TO
REMAND PURSUANT TO
28 U.S.C. § 1447(c)**

Defendant.

Lauren Fitzsimons (P82997)
Felepe H. Hall (P59533)
Jason A. Geissler (P69322)
Assistant Attorneys General
Attorneys for Plaintiff
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
fitzsimonsl@michigan.gov
hallf2@michigan.gov
geisslerj@michigan.gov

*Attorneys for Defendant KalshiEX LLC*

Gjon Juncaj (P63256)
Juncaj Law
Of Counsel to Flannery | Georgalis, LLC
2145 Crooks Rd, Ste 222
Troy, MI 48084
gjon@juncajlaw.com
(248) 385-3065

Jihan M. Williams (P77686)
Flannery | Georgalis, LLC
The Chrysler House
719 Griswold Street, Ste. 280

Detroit, MI 48226
jwilliams@flannerygeorgalis.com
(313) 380-5167

Milbank LLP
Neal Kumar Katyal (*Pro hac vice* forthcoming)
Joshua B. Sterling (*Pro hac vice* forthcoming)
William E. Havemann (*Pro hac vice* forthcoming)
Grant R. Mainland (*Pro hac vice* forthcoming)
Andrew L. Porter (*Pro hac vice* forthcoming)

---

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
TO REMAND PURSUANT TO 28 U.S.C. § 1447(c)**

**TABLE OF CONTENTS**

Page

Index of Authorities ..............................................................................................iii

Concise Statement of Issues Presented ........................................................ x

Introduction ...................................................................................................... 1

Statement of Facts............................................................................................ 3

Legal Standard ................................................................................................ 13

Argument .......................................................................................................... 14

I.    The state law claims do not support federal question jurisdiction. ................ 15

    A.    Kalshi's argument regarding whether the CEA preempts state law is a federal *defense*, not a basis for removal. ................................. 16

    B.    Although Michigan's LSBA contains clearly defined terms, Kalshi claims those should be ignored to indirectly adopt the CEA's terms. ....................................................................................... 17

    C.    The fact that Kalshi is based in New York City does not establish a federal question. ................................................................ 19

II.    The rare doctrine of complete preemption does not apply to the AG's state law claims............................................................................................... 21

    A.    Complete preemption applies to only three statutes—three courts have found the CEA is not one of them.................................... 23

    B.    The CEA provides "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States *or any State*." ............................................................................................ 24

    C.    The CEA does not provide Plaintiff with a parallel federal cause of action...................................................................................... 24

III.    The AG was not required to join the CFTC. .................................................. 25

IV.    Kalshi should be required to pay the AG's costs and any actual expenses, including attorney fees, incurred as a result of the removal.......... 27

Conclusion and Relief Requested ...................................................................... 30

Certificate of Compliance ................................................................................. 31

Certificate of Service......................................................................................... 32

# INDEX OF AUTHORITIES

<u>Page</u>

**Cases**

*Ah Sin v. Wittman,*
    198 U.S. 500 (1905) ................................................................................................. 25

*Bd. of Commissioners, Lucas Cnty., Ohio v. RKKP 2 LLC,*
    No. 3:23 CV 1764, 2024 WL 83027 (N.D. Ohio Jan. 8, 2024) ................................ 13

*Bond v. United States,*
    572 U.S. 844 (2014) ................................................................................................. 25

*Caterpillar Inc. v. Williams,*
    482 U.S. 386 (1987) ................................................................................. 13, 14, 15, 25

*CFTC v. Erskine,*
    512 F.3d 309 (6th Cir. 2008) ................................................................................... 10

*CFTC v. White Pine Tr. Corp.,*
    574 F.3d 1219 (9th Cir. 2009) ................................................................................. 10

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.,*
    767 F. Supp. 3d 556 (W.D. Mich.), <u>aff'd,</u> 162 F.4th 631 (6th Cir. 2025) ........... 20, 21

*City of Oakland v. BP PLC,*
    969 F.3d 895 (9th Cir. 2020) ................................................................................... 24

Coinbase
    (No. 2:25-cv-14092 (E.D. Mich.) ............................................................................... 6

*Empire Healthchoice Assurance, Inc. v. McVeigh,*
    547 U.S. 677 (2006) ................................................................................................. 22

*Farmers Co-op Elevator v. Doden,*
    946 F. Supp. 718 (N.D. Iowa 1996) ......................................................................... 23

*Georgia Gambling Recovery LLC v. Kalshi Inc.,*
    2026 WL 279375 (M.D. Ga. Feb. 3, 2026) .............................................................. 18

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
    527 U.S. 173 (1999) ................................................................................................. 25

Gulf Offshore Co. v. Mobil Oil Corp.,
    453 U.S. 473 (1981) ................................................................................................. 13

*Gunn v. Minton,*
 568 U.S. 251 (2013) ...................................................................................... 16

*Harnden v. Jayco, Inc.,*
 496 F.3d 579 (6th Cir. 2007) ........................................................................ 13

*Hudak v. Elmcroft of Sagamore Hills,*
 566 F. Supp. 3d 771 (N.D. Ohio 2021), aff'd, 58 F.4th 845 (6th Cir. 2023)............ 23

*KalshiEX, LLC v. Bird, et al.,*
 No. 4:26-cv-00109 (S.D. Iowa)........................................................................ 4

*KalshiEX LLC v. CFTC,*
 No. 23-cv-03257 (D.D.C.) .............................................................................. 1

      (Doc. No. 17-1) (Memorandum of Law in Support of Plaintiff's Motion
      for Summary Judgment) (Jan. 25, 2024) ......................................................... 1

*KalshiEx, LLC v. Cafferelli,*
 No. 3:25-cv-02016 (D. Conn.) ........................................................................ 3

*KalshiEX, LLC v. Cox, et al.,*
 No. 2:26-cv-00151 (D. Utah) ......................................................................... 3

*KalshiEX, LLC v. Flaher*ty,
 No. 1:25-cv-02152 (D.N.J.) ........................................................................... 3

*KalshiEX, LLC v. Hendrick,*
 No. 2:25-cv-00575 (D. Nev.) .......................................................................... 3

*KalshiEX, LLC v. Hendrick,*
 No. 25-7516 (9th Cir.) .................................................................................. 3

*KalshiEX, LLC v. Johnson, et al.,*
 No. 2:26-cv-01715 (D. Ariz.) ......................................................................... 4

*KalshiEX, LLC v. Martin,*
 No. 1:25-cv-01283 (D. Md.) ........................................................................... 3

*KalshiEx, LLC v. Orgel,*
 No. 3:26-cv-00034 (M.D. Tenn.) ..................................................................... 3

*KalshiEX, LLC v. Schuler,*
 No. 2:25-cv-01165 (S.D. Ohio)........................................................................ 3

*KalshiEx, LLC v. Williams,*
 No. 1:25-cv-08846 (S.D.N.Y) .......................................................................... 3

*Martin v. Franklin Capital Corp.*,
    546 U.S. 132 (2005) ...........................................................................................28

*Massachusetts v. KalshiEX LLC*,
    No. 1:25-cv-12595 (D. Mass.) ............................................................................ 4

        (Doc. No. 1) (*Mass.* Notice of Removal) (Sept. 22, 2025)................................... 4

        (Doc. No. 31) (Kalshi's Opposition to Motion to Remand) (Oct. 15, 2025)........ 4

        (Doc. No. 34) (*Mass.* Remand Order) (Oct. 28, 2025)......................................... 4

*Mays v. City of Flint, Mich.*,
    871 F.3d 437 (6th Cir. 2017)............................................................................. 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ........................................................................................... 10

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018) ...........................................................................................17

*Nevada v. Blockratize, Inc., et al.*,
    No. 3:26-cv-00089 (D. Nev.) ............................................................................... 5

        (Doc. No. 41) (Remand Order) (Feb. 5, 2026)..................................................... 5

*Nevada v. KalshiEX LLC*,
    No. 2:26-cv-00406 (D. Nevada) ......................................................................... 3

        (Doc. No. 1) (*Nevada* Notice of Removal) (Feb. 17, 2026) ............................. 3, 5

        (Doc. No. 45) (*Nevada* Remand Order) (Mar. 2, 2026) ................................. 3, 5

        (Doc. No. 47) (Kalshi Notice of Appeal of Order Granting Motion to Remand)
        (March 3, 2026) ................................................................................... 6, 26

*Palkow v. Transp., Inc.*,
    431 F.3d 543 (6th Cir. 2005).............................................................................. 15

Polymarket
    (No. 1:26-cv-00710 (W.D. Mich.)........................................................................ 6

Robinhood
    (No. 1:26-cv-00730 (W.D. Mich.)........................................................................ 6

*Roddy v. Grand Trunk Western R.R. Inc.,*
  *395 F.3d 318* (6th Cir. 2005).................................................................. 22, 23, 25, 28

*Royal Canin U.S.A., Inc. v. Wullschleger,*
  604 U.S. 22 (2025) ........................................................................................... 15, 16

*S. Dakota v. Wayfair,*
  585 U.S. 162 (2018) ............................................................................................... 21

*State ex rel. Reading v. W.U. Tel. Co.,*
  336 Mich. 84 (1953) .............................................................................................. 21

*State of Nevada ex rel Nevada Gaming Control Board v. KalshiEx, LLC,*
  No. 2:26-CV-00406-MMD-MDC, 2026 WL 579364 (D. Nev., March 2, 2026).......... 5

*Strong v. Telectronics Pacing Sys., Inc.,*
  78 F.3d 256 (6th Cir. 1996) ................................................................................... 13

*Talley v. Mathis,*
  453 S.E.2d 704 (Ga. 1995)............................................................................... 18, 19

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n,*
  322 F.3d 1039 (9th Cir. 2003) ............................................................................... 11

**Statutes**

17 C.F.R. § 33.3(a).................................................................................................. 11

17 C.F.R. § 38.4(b).................................................................................................. 11

17 C.F.R. § 40.11(a)................................................................................................ 12

7 U.S.C. § 2(a) ................................................................................................... 10, 24

7 U.S.C. § 2(a)(1)(A) ...................................................................................... 11, 24, 28

7 U.S.C. § 2(e) ....................................................................................................... 11

7 U.S.C. § 6(a) ....................................................................................................... 11

7 U.S.C. § 7................................................................................................................ 10

7 U.S.C. § 7a-2(c)(1)–(2)........................................................................................ 11

7 U.S.C. § 7a-2(c)(3) .............................................................................................. 12

7 U.S.C. § 7a-2(c)(5) .............................................................................................. 12

7 U.S.C. 7a-2(c)(5)(C)(j)(V) ........................................................................... 1

12 U.S.C. §§ 85 & 86 ................................................................................... 23

15 U.S.C. § 3001(a)(1)–(2) .......................................................................... 25

28 U.S.C. § 1331 ............................................................................... 14, 15, 28

28 U.S.C. § 1442(a)(1) ............................................................................ 26, 27

28 U.S.C. § 1447(c) ................................................................................. 28, 29

28 U.S.C. § 1447(d) .................................................................................. 5, 26

28 U.S.C. § 3701 *et seq.* ............................................................................... 17

29 U.S.C. § 185 ............................................................................................ 23

29 U.S.C. § 1001 *et seq.* ............................................................................... 23

31 U.S.C. § 5361 *et seq.* ......................................................................... 17, 18

31 U.S.C. § 5361(b) ..................................................................................... 18

31 U.S.C. § 5362(1)(E)(ii) ........................................................................... 17

31 U.S.C. § 5363 .......................................................................................... 17

Mich. Comp. Laws § 125.2002 ...................................................................... 9

Mich. Comp. Laws § 432.201 *et seq.* ............................................................. 7

Mich. Comp. Laws § 432.218(1)(a) .............................................................. 16

2019 Pub. Act 149, Mich. Comp. Laws § 432.401 *et seq.* ...................... 2, 6, 7

Mich. Comp. Laws § 432.402(b) ................................................................... 18

Mich. Comp. Laws § 432.402(d) .................................................................... 6

Mich. Comp. Laws § 432.403(bb) ................................................................ 19

Mich. Comp. Laws § 432.403(ee) ................................................................... 7

Mich. Comp. Laws § 432.403(u) .................................................................... 7

Mich. Comp. Laws § 432.403(v) .................................................................... 7

Mich. Comp. Laws § 432.404(1) ................................................................................ 6

Mich. Comp. Laws § 432.404(7) ................................................................................ 7

Mich. Comp. Laws § 432.405(1) ............................................................................. 7, 8

Mich. Comp. Laws § 432.405(2) ............................................................................. 8, 9

Mich. Comp. Laws § 432.406(1)(a) ........................................................................... 7

Mich. Comp. Laws § 432.406(1)(b) ........................................................................... 7

Mich. Comp. Laws § 432.409(2) ........................................................................... 8, 16

Mich. Comp. Laws § 432.412 ..................................................................................... 8

Mich. Comp. Laws § 432.413(1)(a) .......................................................................... 16

Mich. Comp. Laws § 432.414 ..................................................................................... 8

Mich. Comp. Laws § 432.415a ................................................................................... 9

Mich. Comp. Laws § 432.416 ..................................................................................... 9

Mich. Comp. Laws § 750.301 ............................................................................... 6, 16

Mich. Comp. Laws § 750.304 ................................................................................... 16

Mich. Comp. Laws § 750.305 ................................................................................... 16

Mich. Comp. Laws § 750.307 ................................................................................... 16

O.C.G.A. § 13-8-3 ................................................................................................... 18

Pub. L. No. 74–675, § 3, 40 Stat. 1491 (1936).......................................................... 10

Pub. L. No. 93–463, § 201(b), 88 Stat. 1389 (1974) ................................................. 10

Pub. L. No. 111–203, pt. II, 124 Stat. 1376 (2010) ................................................... 10

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) .................................................................. 10

Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and
    Consumer Protection Act* 3 (2017)................................................................... 11, 20

John T. Holden, *Through the Wire Act*,
  95 Wash. L. Rev. 677  (2020) .................................................................. 21

**Rules**

Mich. Admin. Code r. 432.752 .................................................................... 8

Mich. Admin. Code r. 432.753 .................................................................... 8

Mich. Admin. Code r. 432.754 .................................................................... 8

Mich. Admin. Code r. 432.759 .................................................................... 8

Mich. Admin. Code r. 432.772 .................................................................... 8

Mich. Admin. Code r. 432.774 .................................................................... 8

Mich. Court r. 2.205(A) .................................................................... 15, 26

W.D. Mich. L. Civ. R. 7.2 ...................................................................... 31

## CONCISE STATEMENT OF ISSUES PRESENTED

1. Does Kalshi's CEA preemption defense to the enforcement of Michigan's state laws create "federal question jurisdiction" as a basis for removal?

   Plaintiff's answer: No.

2. For complete preemption to apply, (1) the statutory language must indicate that Congress intended to preempt every state law cause of action within the scope of the relevant statute and (2) it must provide a plaintiff with a parallel federal cause of action.  Does the CEA, which has a savings clause for state-court jurisdiction and does not provide a parallel federal cause of action for Plaintiff, "completely preempt" Michigan's Lawful Sports Betting Act?

   Plaintiff's answer: No.

3. The Complaint seeks injunctive relief to stop Kalshi from offering unlicensed sports betting in Michigan.  Was the CFTC required to be joined as a defendant when the adjudication of the Plaintiff's state-law claims against Kalshi will not decide any right, duty, or obligation of the CFTC?

   Plaintiff's answer: No.

x

**INTRODUCTION**

In 2024, Kalshi explained the reference to "gaming" in the CEA, when it was trying to argue its way out of an enforcement action by the CFTC for listing election-related "event contracts."  At that time, Kalshi argued that "[t]he [prohibited] 'gaming' category reaches contracts contingent on games—for example, . . .whether a certain team will win the Super Bowl.  It thus functions as a check on attempts to launder casino-style or sports gambling through the derivatives markets."[1]  To Plaintiff's knowledge, Kalshi has never explained the reversal from its 2024 position that the CEA —and the CFTC's implementing regulations—barred the very sports wagering it now claims is somehow subject to complete preemption under the CEA.

Kalshi's litigation strategy is a calculated financial decision.  Kalshi's 30-day volume recently hit over $10 billion in wagers.[2]  For Kalshi, it is simply financially worth litigating in a manner that extends Kalshi's unlicensed operating time.  Meanwhile, adjusted gross receipts on Michigan's regulated internet sports betting dropped by 32.5% year-over-year and 39.5% month-over-month.[3]

As a result, Kalshi has developed a consistent litigation strategy that is easily identified across states.  Kalshi has commenced actions in federal court, asserting

---

[1] *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, *KalshiEX LLC v. CFTC*, No. 23-cv-03257, Doc. No. 17-1, p. 26 of 55 (D.D.C. Jan. 25, 2024) (citing 7 U.S.C. § 7a-2(c)(5)(C)(j)(V)) (attached as **Exhibit 1**).

[2] Dustin Gouker, *The Handle: Inside Kalshi's First $10 Billion Month*, The Closing Line (Feb. 10, 2026), perma.cc/E4G5-6XLZ.

[3] Press Release, Michigan Gaming Control Board (Feb. 19, 2026) https://tinyurl.com/muu3k7ha.

1

federal claims, in an attempt to front-run expected state enforcement. When Massachusetts filed in its state court, Kalshi quickly filed a notice of removal, which the federal judge clearly identified as a "plain vanilla federal preemption defense" when it remanded that action to state court. Kalshi filed a notice of removal minutes after Nevada filed a state enforcement action in its state court. The Nevada federal court came to a similar conclusion when it remanded that action to the state court.

This Court should come to the same conclusion. Kalshi's asserted grounds for removal are meritless. This case belongs in state court: Michigan law specifically provides that actions to enforce the Lawful Sports Betting Act (LSBA)[4] may be brought by the Attorney General (AG) in the circuit court for Ingham County, and the State has a strong sovereign interest in enforcing its laws in its own courts. This Court should immediately remand the case so that the state court with jurisdiction over this civil enforcement action can put a stop to Kalshi's illegal gambling operations in Michigan.

---

[4] 2019 Pub. Act 149, Mich. Comp. Laws § 432.401 *et seq*.

2

## STATEMENT OF FACTS

**Kalshi and Plaintiff Are <u>Not</u> Litigating Identical Issues in Federal Court**

Kalshi appears to have copy-and-pasted from the Notice of Removal that it filed in Nevada stating that Plaintiff and Kalshi are already litigating in federal court.  *Compare* Notice of Removal (ECF No. 1, PageID.5) (*Mich.* Notice of Removal) *with* Notice of Removal, *Nevada v. KalshiEX LLC*, No. 2:26-cv-00406, p. 3 (D. Nevada Feb. 17, 2026) (Doc. No. 1) (*Nevada* Notice of Removal) ("C. Kalshi and the State are Already Litigating Identical Issues in Federal Court.").  While Kalshi still lost that argument in Nevada (See Order, *Nevada v. KalshiEX LLC*, No. 2:26-cv-00406 (D. Nevada Mar. 2, 2026)  (Doc. No. 45) (*Nevada* Remand Order)), there actually was a separate federal case (*KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir.) going on between Kalshi and the state of Nevada at the time.  No such case exists with Michigan or its AG.

It is true that Kalshi has filed a prolific number of actions in federal court, asserting federal claims, in an attempt to front-run expected state enforcement.  *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575 (D. Nev.); *KalshiEX, LLC v. Flaher*ty, No. 1:25-cv-02152 (D.N.J.); *KalshiEX, LLC v. Martin*, No. 1:25-cv-01283 (D. Md.); *KalshiEX, LLC v. Schuler*, No. 2:25-cv-01165 (S.D. Ohio); *KalshiEx, LLC v. Cafferelli*, No. 3:25-cv-02016 (D. Conn.); *KalshiEx, LLC v. Williams*, No. 1:25-cv-08846 (S.D.N.Y); *KalshiEx, LLC v. Orgel*, No. 3:26-cv-00034 (M.D. Tenn.); *KalshiEX, LLC*

3

*v. Cox, et al.*, No. 2:26-cv-00151 (D. Utah); *KalshiEX, LLC v. Johnson, et al.*, No. 2:26-cv-01715 (D. Ariz.); *KalshiEX, LLC v. Bird, et al.*, No. 4:26-cv-00109 (S.D. Iowa).[5]

In addition, Massachusetts initiated litigation against Kalshi to enforce its state gambling laws in state court.  Kalshi strategically filed a notice of removal a few days after that action was filed in state court, which enabled it to extend the time it could illegally operate while the removal was pending.  Notice of Removal, *Massachusetts v. KalshiEX LLC*, No. 1:25-cv-12595 (D. Mass. Sept. 22, 2025) (Doc. No. 1) (*Mass.* Notice of Removal).  To support removal, Kalshi argued that states were "completely preempted" from exercising jurisdiction over contracts offered by a CFTC-registered exchange.  Kalshi's Opposition to Motion to Remand, *Massachusetts v. KalshiEX LLC*, No. 1:25-cv-12595 (D. Mass. Oct. 15, 2025) (Doc. No. 31).  The federal judge clearly identified and dismissed this meritless argument, explaining:

> Kalshi does not contend that the federal Commodity Exchange Act (CEA) completely preempts the state's traditional police power to regulate sports gambling within its borders.  It argues only that the CEA precludes regulation of the specific subset of sports gambling that Kalshi offers – wagering on designated contract markets. …This is a plain vanilla federal preemption defense, not a claim of complete preemption. [*See* Order, *Massachusetts v. KalshiEX LLC*, No. 1:25-cv-12595 (D. Mass. Oct. 28, 2025) (Doc. No. 34) (*Mass.* Remand Order).]

In Nevada, Kalshi used a similar strategy to continue operating illegally in the state while the removal issue was pending.  On February 17, 2026, the Nevada Gaming Control Board filed a civil enforcement action under Nevada law, seeking to enjoin Kalshi's operations in Nevada until it obtained a Nevada gaming license and

---

[5] *See* Sylvan Lane, *Utah governor blasts Trump regulator for blessing prediction markets*, The Hill (Feb. 17, 2025) https://tinyurl.com/23s5bm7j.

complied with Nevada's gaming laws.  *State of Nevada ex rel Nevada Gaming Control Board v. KalshiEx, LLC*, No. 2:26-CV-00406-MMD-MDC, 2026 WL 579364, at \*1 (D. Nev. Mar. 2, 2026).  Kalshi filed a notice of removal the same day, claiming federal question jurisdiction alleging that the state law claims require the consideration of disputed federal law, "complete preemption" by the CEA, claiming that the CFTC was a "necessary party" and thus invoked jurisdiction under the federal officer removal statute.  *Nevada* Notice of Removal, p. 4-8.  The federal court rejected each of these arguments and granted the motion to remand.  *Nevada* Remand Order, p. 3-10.

Kalshi did not make the federal officer argument in Massachusetts but added it to its removal argument in Nevada after seeing its cohort, Polymarket, make a similar, though slightly more absurd version of the claim that was easily rejected.  *See Nevada* Notice of Removal, *Nevada v. Blockratize, Inc., et al.*, No. 3:26-cv-00089, p. 4 ¶ 6 (D. Nev. Feb. 5, 2026) (Polymarket argued removal was proper because it was a "self-regulatory organization exercising delegated authority from the CFTC" to operate its sports betting business); *see also* Remand Order, Doc. No. 41, p. 5-6 ("the delegated functions Polymarket identified demonstrate compliance, not assistance for Polymarket to fall within the scope of 'acting under' " a federal officer").

The strategy for this odd claim has become clear—unlike most remand orders—it is reviewable on interlocutory appeal.  See 28 U.S.C. § 1447(d).  Kalshi will use an appeal to buy additional unlicensed operating time and ask the reviewing court to "consider all of Kalshi's grounds for removal," because "it is not limited to considering whether remand was proper under Section 1442" as it did in Nevada.  *See*

Kalshi Notice of Appeal of Order Granting Motion to Remand, *Nevada v. KalshiEX, LLC*, No. 2:26-cv-00406 (D. Mass. Mar. 3, 2026) (Doc. No. 47) (cleaned up).

Kalshi did correctly mention that Plaintiff is now involved in federal litigation with its cohorts.  Kalshi's prolific strategy has inspired copycats in Coinbase (No. 2:25-cv-14092 (E.D. Mich.)), Polymarket (No. 1:26-cv-00710 (W.D. Mich.)), and Robinhood (No. 1:26-cv-00730 (W.D. Mich.).

**Michigan Law Comprehensively Regulates Sports Betting**

In Michigan, gambling is prohibited unless specifically authorized by law.  See Mich. Comp. Laws § 750.301.  In December of 2019, the Michigan Legislature enacted the Lawful Sports Betting Act.  Mich. Comp. Laws § 432.401 *et seq*.  In enacting LSBA, the Legislature declared that "[i]n order to protect residents of this state who wager on sports through the internet, including through mobile application, and to capture revenues generated from such sports betting, it is in the best interest of this state and its citizens to regulate this activity establishing a secure, responsible, fair, and legal system of internet sports gaming."  Mich. Comp. Laws § 432.402(d).

LSBA provides that "[i]nternet sports betting may be conducted only to the extent that it is conducted in accordance with this act."  Mich. Comp. Laws § 432.404(1).  "Sports betting" means to operate, conduct, or offer for play wagering conducted under this act on athletic events and other events approved by the board. Sports betting includes, but is not limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in-game betting, proposition bets, and straight bets.

Internet sports betting may only be offered by a licensed sports betting operator.  Mich. Comp. Laws § 432.404(7).  Only casinos that are currently licensed under the Michigan Gaming Control and Revenue Act, Mich. Comp. Laws § 432.201 *et seq.*, and federally authorized Tribal casinos within Michigan can apply for a sports betting operator license.  Mich. Comp. Laws § 432.406(1)(a), (b).

A licensed sports betting operator may utilize an internet sports betting platform, which is defined as an integrated system of hardware, software, applications, including mobile applications and servers through which a sports betting operator operates, conducts, or offers sports betting through the internet.  See Mich. Comp. Laws § 432.403(u), (v) and Mich. Comp. Laws § 432.404(7).  The internet sports betting platform provider is also required to be licensed by the Michigan Gaming Control Board (MGCB).  Mich. Comp. Laws § 432.403(ee).

Michigan's licensed sports betting operators must comply with numerous requirements meant to protect patrons from financial and other harms.  For example, an operator must segregate patron funds from operating funds, must maintain a reserve sufficient to ensure the security of all patron funds, and must timely honor a patron's valid withdrawal request.  In addition, each operator must receive and investigate patron complaints, and patrons are given the option of filing unresolved complaints with the MGCB.

LSBA vests the MGCB with the authority to regulate sports betting.  Mich. Comp. Laws §432.405(1).  The MGCB "has jurisdiction over every person licensed by the board and may take enforcement action against a person that is not

licensed by the board that offers internet sports betting under this act." Mich. Comp. Laws § 432.405(2).  Additionally, the MGCB has "all other powers necessary to enable it to fully and effectively execute this act to administer, regulate, and enforce internet sports betting under this act."  Mich. Comp. Laws § 432.405(1). Included in the MGCB's authority is the ability to investigate and "issue cease and desist orders and obtain injunctive relief against a person that is not licensed by the board that offers internet sports betting in this state."   Mich. Comp. Laws § 432.409(2).

In addition to precluding access to anyone under the age of 21, the MGCB operates a statewide self-exclusion program, and each licensed sports betting operator is required to offer various responsible gaming tools.  At a minimum, such tools must include temporary and permanent self-exclusion, self-imposed responsible gaming limits (e.g., periodic deposit and wagering limits), temporary account suspension, and links to responsible gaming information and resources.[6]  The MGCB actively enforces these responsible gaming provisions as a core part of its mission.

Non-Tribal sports betting operators must pay taxes on gross revenues derived from sports betting activities.  Mich. Comp. Laws § 432.414.  For January 2025 through November 2025, internet sports wagering delivered over $22 million in revenue to the State and over $7 million in revenue to the City of Detroit.  *2025 Internet Sports Betting Revenues and Wagering Tax Information*, Michigan Gaming

---

[6] Mich. Comp. Laws § 432.412; Mich. Admin. Code r. 432.752, r. 432.753, r. 432.754, r. 432.759, r. 432.772, & r. 432.774.

Control Board https://tinyurl.com/542px2sx. The revenue to the State is primarily allocated to the Compulsive Gambling Prevention Fund, the Michigan Strategic Fund,[7] the First Responder Presumed Coverage Fund,[8] and the School Aid Fund. Mich. Comp. Laws §§ 432.415a, 432.416. Unlicensed sportsbooks undercutting the regulated market has already resulted in ever-decreasing adjusted gross receipts for law-abiding licensees, with the most recent being a 39.5% drop month-over-month. *Press Release*, Michigan Gaming Control Board (Feb. 19, 2026) https://tinyurl.com/muu3k7ha.

**The CFTC Regulates Commodities Trading and Dodd-Frank is <u>Not</u> an "Interstate Internet Sports Betting and Gambling Act"**

Regardless of which court this case is in, Kalshi's fundamental arguments all hinge on a single simple idea. The idea is that although Congress called it the "Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010" with the goal of preventing the excessive risk-taking that led to the financial crisis of 2008, Kalshi contends that this Court should instead consider Dodd-Frank to be a kind of "Interstate Internet Sports Betting and Gambling Act." As described below, both the text and context of Dodd-Frank reveal that is not true.

The CFTC regulates trading in commodity derivatives—financial instruments that companies use to manage risk. It is not a gaming regulator.

---

[7] The Michigan Strategic Fund promotes economic development and the creation of jobs in the State. Mich. Comp. Laws § 125.2002.

[8] The First Responder Presumed Coverage Fund provides workers' disability compensation benefits to certain first responders. Mich. Comp. Laws § 418.405(2).

In 1936, Congress enacted the CEA to regulate trading in futures in wheat, corn, and other agricultural commodities.  Pub. L. No. 74–675, § 3, 40 Stat. 1491 (1936).  A "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date.  *CFTC v. Erskine*, 512 F.3d 309, 315 (6th Cir. 2008). Businesses use futures to hedge against price volatility.  *Id.* at 317.  The CEA initially authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading.  7 U.S.C. § 7 (1936).

In 1974, Congress expanded the CEA to cover additional commodities, including non-agricultural commodities.  Pub. L. No. 93–463, § 201(b), 88 Stat. 1389 (1974).  A "derivative" is a contract whose value depends on the performance of an underlying asset, such as a commodity.  *Black's Law Dictionary* (12th ed. 2024).  An "option" is a contract that "grants to the purchaser the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price."  *CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (internal quotation marks omitted).

Also in 1974, Congress created the CFTC "to consolidate federal regulation of commodity futures trading" in one agency.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982).  To that end, Congress gave the CFTC "exclusive jurisdiction" over futures and options that are traded on DCMs or other markets.  *Id.*; *see* 7 U.S.C. § 2(a) (1974).

In 2010, Congress enacted the Dodd-Frank Act, which expanded the CEA to cover "swaps."  Pub. L. No. 111–203, pt. II, 124 Stat. 1376, 1658–754 (2010).  A "swap"

10

is an agreement between two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042–43 (9th Cir. 2003). Congress added "swaps" to the CEA because certain swaps, known as "credit default swaps," had exacerbated the financial crisis.  Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 3 (2017).

Thus, subject to certain exclusions allowing for the application of state law, after the Dodd-Frank Act, the CFTC has "exclusive jurisdiction" over commodity derivatives, including "swaps," " 'option[s]' " and "contracts of sale of a commodity for future delivery" (*i.e.,* futures) that are "traded or executed on a [designated] contract market" or "any other board of trade, exchange, or market."  7 U.S.C. § 2(a)(1)(A). The mere fact that a contract is traded on a DCM does not make it subject to the CFTC's "exclusive jurisdiction"; it also must qualify as one of the listed types of commodity derivatives (such as a swap, option, or future). *Id.*  Further, if a consumer contract qualifies as a swap, option, or future, it can be traded *only* on a CFTC-registered DCM.  *See id.* § 2(e) (swaps); *id.* § 6(a) (futures); 17 C.F.R. § 33.3(a) (options).  It cannot be traded anywhere else.

To offer a contract for trading, a DCM can self-certify that the contract complies with the CEA and immediately start trading, without any action by the CFTC.  7 U.S.C. § 7a-2(c)(1)–(2).  In its self-certification, the DCM must identify whether the contract is a swap, option, or future. *See* 17 C.F.R. § 38.4(b).  The CFTC

11

can review a self-certification and disallow a contract that fails to comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(3).

Further, under the "Special Rule," the CFTC may disallow a contract that involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." 7 U.S.C. § 7a-2(c)(5). Exercising its authority under the Special Rule, the CFTC categorically prohibited contracts "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a).

**Kalshi Offers Unlicensed Gambling**

Kalshi does not currently possess and has not applied for a license to participate in Michigan's sports betting framework. Compl. ¶¶ 30-33 (ECF No.1-1, PageID.19). Despite that, Kalshi allows Michigan consumers to place bets on its platform through its website, https://kalshi.com, and through its mobile application ("app") on the Android and iOS (Apple) platforms. Compl. ¶ 40 (ECF No. 1-1, PageID.20). Ninety-five percent of Kalshi's revenues are from sports contracts. Sam Learner, *Prediction Markets Barely Make Money; Sportsbooks Make Money*, Fin. Times (Dec. 19, 2025), perma.cc/CB9N-SN6P.

The types of sports bets offered to Michigan residents are numerous, and Kalshi keeps adding more. Examples of recent offerings included whether the Detroit Pistons and the Washington Wizards would combine for more than 224.5 points, and whether Rider University would win by more than 9.5 points in its college basketball game against Marist University. Compl. ¶ 56 (ECF No. 1-1, PageID.23-24).

12

On March 3, 2026, the AG filed a complaint for permanent injunction and to abate nuisance against Kalshi in Ingham County Circuit Court.  And on March 5, 2026, Kalshi filed a notice of removal in the United States District Court for the Western District of Michigan.  *Mich.* Notice of Removal (ECF No.1, PageID.1-45).

## LEGAL STANDARD

"The party seeking removal jurisdiction bears the burden of stating facts in its notice of removal demonstrating an entitlement to removal jurisdiction."  *Bd. of Commissioners, Lucas Cnty., Ohio v. RKKP 2 LLC*, No. 3:23 CV 1764, 2024 WL 83027, at \*2 (N.D. Ohio Jan. 8, 2024).

It is black-letter law that state courts have both the power and the duty to address federal issues that arise in state court.  *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78 (1981).  It is "settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).

A defendant may remove a case to federal court only if that court had jurisdiction to hear the case in the first place.  *Strong v. Telectronics Pacing Sys., Inc.*, 78 F.3d 256, 256 (6th Cir. 1996).  "[R]emoval statutes are to be strictly construed, and 'all doubts should be resolved against removal.'"  *Mays v. City of Flint, Mich.,* 871 F.3d 437, 442 (6th Cir. 2017) (quoting *Harnden v. Jayco, Inc.*, 496 F.3d 579, 581 (6th Cir. 2007)).  Whether a district court has federal-question jurisdiction is determined

13

under the "well-pleaded complaint rule" in which only "the face of the plaintiff 's properly pleaded complaint" is considered. *Caterpillar*, 482 U.S. at 392.

## ARGUMENT

Consistent with its approach to state court actions in both Massachusetts and Nevada, Kalshi asserts three meritless theories of removal. *See generally Mass.* Remand Order; *Nevada* Remand Order. First, Kalshi argues that there is federal question jurisdiction under 28 U.S.C. § 1331 because adjudicating the state law claims necessarily depends on the resolution of federal law. But the complaint does not include a single reference to federal law; the only federal question here is Kalshi's preemption defense. Binding precedent establishes that a federal defense does not create federal-question jurisdiction.

Second, Kalshi argues that the AG's claims are subject to complete preemption. But no court has ever held that the CEA effects "complete preemption" of state law, and this Court should not be the first. No provision of the CEA shows a congressional intent to take away all state causes of action (to the contrary, the CEA has a savings clause for state-court jurisdiction), and the CEA does not provide a cause of action that addresses the same unlawful conduct that the AG seeks to address—so the two key prerequisites for complete preemption are missing here.

Third, Kalshi argues that the CFTC is an essential defendant under the Michigan court rules, and if the CFTC had been joined Kalshi would be able to remove the case under the federal officer removal statute. But Michigan is not seeking to enforce the gaming laws against the CFTC; it is seeking to enforce them against

14

Kalshi.  The CFTC's presence in this action is not essential to the rendering of complete relief and thus it did not need to be named as a defendant.  See Mich. Court r. 2.205(A).

## I.    The state law claims do not support federal question jurisdiction.

Kalshi first argues that this case belongs in federal court because it "arises under" federal law.  *See Mich.* Notice of Removal, ¶¶ 12-20 (ECF No.1, PageID.5-7).  Kalshi is wrong.

The AG filed this action in Michigan state court, seeking to enforce state gaming law, and asserting only state-law causes of action.  Compl. ¶¶ 90-102 (ECF No. 1-1, PageID.31-33). "The [well-pleaded complaint] rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  There is no federal claim on the face of the well-pleaded complaint.  That is the end of the jurisdictional inquiry.  *See id.*

Federal courts have jurisdiction to decide cases "arising under" federal law. 28 U.S.C. § 1331; *see Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). "Arising under" jurisdiction is carefully circumscribed: A case "arises under" federal law only if either (1) federal law creates the cause of action, or (2) a "substantial question of federal law is a necessary element of a plaintiff's well-pleaded complaint." *Palkow v. Transp., Inc.,* 431 F.3d 543, 550 (6th Cir. 2005).  Kalshi relies only on the second category.

15

Kalshi argues that this is one of the "rare" class of cases in which a complaint asserting only state-law claims nonetheless "necessarily raise[s]" a "substantial" and "actually disputed" federal issue—that is, where it is not legally possible to decide the cause of action without addressing federal law. *Royal Canin*, 604 U.S. at 26; *see Gunn v. Minton*, 568 U.S. 251, 258 (2013) (referring to the second category as a "special and small category" of cases). Kalshi is wrong, and its position (if accepted) would dramatically expand federal-question jurisdiction.

### A.    Kalshi's argument regarding whether the CEA preempts state law is a federal *defense*, not a basis for removal.

Kalshi's main argument is that a court cannot decide whether Kalshi is violating Michigan law without also deciding whether state law is preempted by the federal CEA. *Mich.* Notice of Removal, ¶¶ 12-20 (ECF No.1, PageID.5-7). But that preemption issue was not raised by the AG in the complaint; instead, it is a preemption defense. If Kalshi believes federal law supplies a defense to the claims in the Complaint, it is free to raise that defense in state court. However, Kalshi may not transform a state-law enforcement action into a federal case through removal.

Michigan's complaint pleaded only state law causes of action: claims for injunctive relief under Mich. Comp. Laws § 432.409(2) and to abate violations of Michigan's gaming laws, including Mich. Comp. Laws §§ 432.413(1)(a), 432.218(1)(a), 750.301, 750.304, 750.305 and 750.307. Those claims can be decided without addressing federal law. Whether Kalshi's unlicensed operations violate Michigan law depends on what contracts it is offering, whether its sports bets qualify as "sports

16

betting," whether it is selling pools or registering bets under Michigan law, and whether it is licensed, pays Michigan taxes, and otherwise complies with Michigan gaming law. *See* Compl. ¶¶ 90-102 (ECF No. 1-1, PageID.31-33).

> **B.     Although Michigan's LSBA contains clearly defined terms, Kalshi claims those should be ignored to indirectly adopt the CEA's terms.**

Kalshi's position can be summed up as a convoluted argument that Michigan's LSBA actually relies on UIGEA, → which in turn relies on the CEA, → which in turn relies on whether a DCM has self-certified that it gets to list a transaction → Kalshi has self-certified that it gets to list sports bets. → Therefore, Kalshi defines what counts as "internet sports betting" under Michigan's LSBA. Unsurprisingly, that is incorrect.

For context, before 2018, Nevada was the only state that allowed casino-style sports betting because of the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3701 *et seq.; Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 462 (2018). After the Supreme Court invalidated PASPA, other states became free to choose whether and to what extent they would allow sports betting. Thus, Michigan's LSBA was passed in 2019.

In 2006, Congress passed the Unlawful Internet Gambling Enforcement Act (UIGEA), 31 U.S.C. § 5361 *et seq.*—which supplements the Wire Act by making it a crime to *fund* illegal online betting, *id.* § 5363. Congress defined "bet" and "wager" for purposes of the UIGEA to exclude transactions on DCMs, *see id.* § 5362(1)(E)(ii). But those definitions do not apply outside the UIGEA; the UIGEA expressly states

17

"[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." *Id.* § 5361(b).  In other words, UIGEA was intentionally drafted to apply only to *unlawful* gambling operations.

If Kalshi is going to argue that LSBA "expressly provides" that it "shall be interpreted consistent with UIGEA," it should be able to quote the provision.  *Mich.* Notice of Removal, ¶ 15 (ECF No. 1, PageID.5).  Kalshi cannot do that because the provision it cited does not say that.

Mich. Comp. Laws §  432.402(b) provides, in relevant part,

This act is *consistent and complies* with the unlawful internet gambling enforcement act of 2006, 31 USC 5361 to 5367 . . . and permits the use of the internet, including through mobile application, to place, receive, or otherwise knowingly transmit a sports bet or wager if that use complies with this act and rules promulgated under this act. [Emphasis added].

This is not a rule of interpretation for LSBA.  It is an acknowledgment that UIGEA is on the books and LSBA is consistent because UIGEA only applies to unlawful gambling and does not apply to this new form of gambling that the state has made lawful under LSBA.[9]

---

[9] Kalshi relies (*Mich.* Notice of Removal, ¶ 17 (ECF No. 1, PageID.17)) on a federal district court case from Georgia, *Georgia Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375 (M.D. Ga. Feb. 3, 2026).  That case also involved a state-law claim against a prediction market.  But the state law at issue there is nothing like the Nevada law at issue here.  The Georgia law in *Georgia Gambling* provided that "[g]ambling contracts" were "void," and authorized recovery of "[m]oney paid . . . upon a gambling consideration" in connection with such contracts, O.C.G.A. § 13-8-3, and the Georgia Supreme Court had stated that whether a gambling contract was void under this provision "depends on whether the contract is unlawful under the law governing its validity," *Georgia Gambling*, 2026 WL 279375, at *3 (citing *Talley v. Mathis*, 453

Further, Kalshi just completely ignores the fact that LSBA defines "sports betting" with the general definition that includes the term "wagering," but it also includes an explicit list:

> Sports betting *includes, but is not limited to*, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in-game betting, proposition bets, and straight bets.    [Mich. Comp. Laws § 432.403(bb)].

If Kalshi wants to quibble about what "sports betting" really means or what a "parlay" is under LSBA, the proper place to do that is state court.

### C.     The fact that Kalshi is based in New York City does not establish a federal question.

It is unclear what "federal question" Kalshi is trying to assert by saying it is based in New York City.  *Mich.* Notice of Removal, ¶ 16 (ECF No. 1, PageID.17).  It sounds like some kind of factual defense to Plaintiff's Complaint, which would absolutely be appropriate to quibble about during discovery in state court.

Kalshi then cites *Churchill Downs*[10] to support this proposition, which is a case about *gambling*.  If Kalshi is using federal case law on gambling to make its

---

S.E.2d 704 (Ga. 1995)).  As a result, to succeed on its state-law claim, the plaintiff had to prove that the challenged contracts were illegal under federal law. *See id.* at *2–3. Kalshi can identify no similar incorporation of federal law into the elements of the AG's state-law claims here.

[10] *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 767 F. Supp. 3d 556 (W.D. Mich.), aff'd, 162 F.4th 631 (6th Cir. 2025) (hereinafter, "*Churchill Downs*").

19

argument, it seems to have at least conceded this is in fact gambling, which is consistent with how Kalshi advertises.[11]

*Churchill Downs* was quite explicitly a dispute about the interaction of the "Interstate Horseracing Act" (IHA) and the "Michigan Horse Racing Law of 1995. *See generally*, *Churchill Downs.* As discussed above, *supra* pp. 10-11, Congress added "swaps" to the CEA because it wanted to regulate certain swaps that were previously largely unregulated, known as "credit default swaps," which had exacerbated the financial crisis. Cong. Rsch. Serv., R41350, The Dodd-Frank Wall Street Reform and Consumer Protection Act 3 (2017). Congress did not add "swaps" to the CEA because it was secretly making Dodd-Frank the "Interstate Internet Sports Betting and Gambling Act." The IHA is expressly a federal interstate statute intended to interact with state gambling law on horseracing. The IHA and Dodd-Frank are not the same thing.

Kalshi also cites this quote from *Churchill Downs*, "Until a wager is accepted, it is not prohibited gambling conduct, and when that wager is accepted out of state, the gambling conduct did not take place within the jurisdictional reach of Michigan's gambling prohibitions. *State ex rel. Reading*, 57 N.W.2d at 539."[12] *Id*. at 576.

---

[11] Although Kalshi claims these are "event contracts" in this litigation, Kalshi actively advertised such contracts as sports betting. Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), perma.cc/CWK2-TZCV.

[12] Inherent in this assertion appears to be Kalshi's admission that it, or its subsidiary, is truly the other party accepting these bets, despite claiming in prior litigation to be different from other sportsbooks in that regard.

*Churchill Downs* was citing to a 1953 decision regarding bets placed between two individuals in different states over a telegraph.  *See State ex rel. Reading v. W.U. Tel. Co.*, 336 Mich. 84, 89 (1953).[13]

Notably, the Sixth Circuit did not adopt this reasoning in its decision affirming *Churchill Downs*, likely because it is fundamentally inconsistent with *S. Dakota v. Wayfair*, 585 U.S. 162, 181 (2018), which provides that:

> Between targeted advertising and instant access to most consumers via any internet-enabled device, a business may be present in a State in a meaningful way without that presence being physical in the traditional sense of the term.  *S. Dakota v. Wayfair*, 585 U.S. 162, 181 (2018) (cleaned up).

Under Kalshi's 1953 logic, every company that wanted to avoid Michigan's restrictions and offer sports betting to Michigan's children could just set up a location or internet server that "accepts" wagers out of state or out of country, and there would be nothing the state could do about it.  That would be absurd and inconsistent with the Wire Act.

## II.    The rare doctrine of complete preemption does not apply to the AG's state law claims.

Kalshi next argues that the "complete preemption" doctrine applies.  *Mich.* Notice of Removal, ¶¶21-23 (ECF No. 1, PageID.7-9).  This is not one of the exceedingly rare cases of complete preemption.

---

[13] This has also essentially been overruled by the Wire Act of 1961, which was designed to address the issue of companies, like Western Union Telegraph, and individuals evading state gambling laws under this logic.  *See generally* John T. Holden, *Through the Wire Act*, 95 Wash. L. Rev. 677  (2020)

Complete preemption applies when "the pre-emptive force of the statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Roddy v. Grand Trunk Western R.R. Inc., 395 F.3d 318, 323* (6th Cir. 2005) (internal quotation marks omitted).  In that case, "any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.*  In other words, Congress has decided that this is an area that is so completely federal in nature that any case raising any issue related to the statute necessarily is a federal issue.

For complete preemption to apply, two requirements must be met.  First, the statutory language must indicate that Congress intended to preempt every state law cause of action within the scope of the relevant statute.  See *Roddy,* 395 F.3d at 323.  This intent will not be lightly inferred: "[i]f Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 698 (2006).

Second, the statute must provide "a parallel federal cause of action that would 'convert' a state cause of action into the federal action for purposes of the well-pleaded complaint rule." *Roddy,* 395 F.3d at 323.  In other words, a federal statute must not only override state law but also give plaintiffs a federal claim they can use in its place—one that lets them seek relief for the same alleged harm, just in federal court under federal law instead of under state law.  *Id.*

22

**A.    Complete preemption applies to only three statutes—three courts have found the CEA is not one of them.**

Unsurprisingly, given the extraordinary showing required, "[c]omplete preemption is rare." *Hudak v. Elmcroft of Sagamore Hills*, 566 F. Supp. 3d 771, 781 (N.D. Ohio 2021), aff'd, 58 F.4th 845 (6th Cir. 2023).  Indeed, "the Supreme Court has recognized complete preemption under only three statutes: § 301 of the Labor Management Relations Act, 1947 (LMRA), 29 U.S.C. § 185, § 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, and § 30 of the National Bank Act, 12 U.S.C. §§ 85 & 86.  *Roddy*, 395 F.3d at 323.  Kalshi identifies no decision concluding that the CEA is one of the extraordinary situations where Congress intended complete preemption.

To the contrary, district courts in Massachusetts and Nevada rejected the same argument Kalshi already made in an attempt to remove similar state-law enforcement proceedings brought by those states.  *See Mass.* Remand Order; *Nevada* Remand Order, p. 7-9.  As the court explained, the CEA lacks the "clear Congressional intent to displace state regulation" needed for complete preemption to apply.  *Id.*  The only other court that has addressed the issue came to the same conclusion.  *See Farmers Co-op Elevator v. Doden*, 946 F. Supp. 718, 728-29 & n.4 (N.D. Iowa 1996) (noting CEA did not have the "necessary 'extraordinary' preemptive force" required for complete preemption).

23

**B.    The CEA provides "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States *or any State.*"**

For its complete preemption argument, Kalshi relies solely on one provision in the CEA, 7 U.S.C. § 2(a).  *Mich.* Notice of Removal, ¶¶ 21-23 (ECF No. 1, PageID.7-9).  That provision states that "[t]he [CFTC] shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps. . . , traded or executed on a [designated] contract market."  7 U.S.C. § 2(a).  But this provision does not apply here because Kalshi's sports event contracts are not swaps.

Even if Section 2(a) did apply, nothing in that provision establishes clear congressional intent to displace all state causes of action that are conceivably related to the swaps traded on DCMs.  To the contrary, Congress made clear that it had precisely the opposite intent, stating that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States *or any State.*"  7 U.S.C. § 2(a)(1)(A) (emphasis added).  The Court's inquiry can end there.  Where "a federal statute has a saving clause of this sort, Congress did not intend complete preemption, because there would be nothing . . . to "save" if Congress intended to preempt every state cause of action within the scope of the statute."  *City of Oakland v. BP PLC*, 969 F.3d 895, 908 (9th Cir. 2020).

**C.    The CEA does not provide Plaintiff with a parallel federal cause of action.**

Kalshi asserts that the "CEA supplies a federal cause of action that 'replaces the state cause of action.'"  *Mich.* Notice of Removal, ¶ 22 (ECF No. 1, PageID.8)

24

quoting *Caterpillar*, 482 U.S. at 391 n.4).  What is that cause of action?  Kalshi never elaborates.

The CEA is not a gaming statute, and it does not contain any provision that would provide equivalent relief to state gaming laws.  Nothing in the CEA creates a federal cause of action to address the same unlawful conduct that the AG seeks to enjoin here, *i.e.*, engaging in unlicensed sports betting in violation of state law, without adhering to the safeguards that Michigan imposes to protect the public, and without paying the state taxes and fees.  Thus, there is no federal cause of action that would allow the AG  to remedy the harm she asserts the State has suffered.  *Roddy*, 395 F.3d at 323.

The Supreme Court has long recognized that the regulation of gaming lies within the state's police power.  *See Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185 (1999).  Federal law "defer[s] to, and even promote[s], differing gambling policies in different States." *Id.* at 187; *see* 15 U.S.C. § 3001(a)(1)–(2).  Kalshi thus would need to show exceptionally clear congressional intent to preempt state gaming law, and an even clearer intent to foreclose all state causes of action to enforce state gaming law and turn them into actions under the CEA.  *Bond v. United States*, 572 U.S. 844, 858–59 (2014).  It has not done so.

## III.    The AG was not required to join the CFTC.

Finally, Kalshi argues that the AG should have named the CFTC as a party, and if the AG had done so, this Court would have jurisdiction under the federal officer

removal statute, 28 U.S.C. § 1442(a)(1).  *Mich.* Notice of Removal, ¶¶ 24-25 (ECF No. 1, PageID.9).  Specifically, Kalshi contends that under Mich. Court r. 2.205(A), the AG was required to name the CFTC as a defendant in its request for injunctive relief, because the CFTC had "such interest in the subject matter of an action that their presence in the action is essential to permit the court to render complete relief."  *Id.* (quoting Mich. Court r. 2.205(A)).  It argues that by failing to join the CFTC, the AG engaged in "artful pleading" to sidestep federal-agency jurisdiction.  *Id.*  Ironically, this is yet another strategic maneuver by Kalshi.[14]

Here, the CFTC has no legal interest in this case.  The AG is trying to enforce Michigan gaming law against Kalshi because of its unlicensed operations in the State. The AG is not trying to enforce Michigan gaming law—or any state law—against the CFTC.  Further, the CFTC does not face any legal exposure from the relief sought by the AG, which is a declaration that Kalshi's unlicensed gambling operations is a common law nuisance in violation of Michigan law and an injunction ordering Kalshi to stop its operations until it obtains a Michigan license and complies with Michigan requirements.  In other words, this action will not adjudicate any of the CFTC's legal rights, duties, or obligations.

---

[14] See supra. p. 5.  As explained in the Statement of Facts, Kalshi's addition of the federal officer claim for removal has a clear strategic purpose—unlike most remand orders—it is reviewable on interlocutory appeal.  *See* 28 U.S.C. § 1447(d).  Kalshi will attempt to use an appeal to buy additional unlicensed operating time and ask the reviewing court to "consider all of Kalshi's grounds for removal, and is not limited to considering whether remand was proper under Section 1442" as it did in Nevada.  *See* Kalshi Notice of Appeal of Order Granting Motion to Remand, *Nevada v. KalshiEX, LLC*, No. 2:26-cv-00406 (D. Mass. March 3, 3036) (Doc. No. 47) (cleaned up).

Kalshi asserts that the CFTC has a "substantial interest" in presenting a preemption argument that explains its view of its federal authority. *Mich.* Notice of Removal, ¶¶ 21-23 (ECF No. 1, PageID.7-9). That is not the type of legal interest that requires joinder. At most, the CFTC may be concerned about the practical effect of a decision in the AG's favor on Kalshi and other DCMs, but that does not implicate its own legal rights. If the CFTC wishes to provide its views, it could file an *amicus* brief. But an inchoate interest in a case is not enough to require joinder of a federal agency as a party.

Kalshi's argument, if accepted, would dramatically expand federal-officer removal. Under its theory, a federal agency would have a "substantial interest" requiring joinder whenever the agency "claim[s]" an "interest" in the scope of its "jurisdiction." *Id.* Once joined, the federal agency could claim that state law is preempted and force the removal of a state-law suit under 28 U.S.C. § 1442(a)(1), even though it is settled law that a preemption defense does not represent a basis for removal. Kalshi cites no case permitting removal in remotely similar circumstances, and this Court should not be the first.

## IV.    Kalshi should be required to pay the AG's costs and any actual expenses, including attorney fees, incurred as a result of the removal.

Kalshi already knew that this case did not arise under federal law because it has been told as much by two different federal courts when it employed the same arguments on removal. *See generally Mass.* Remand Order; *Nevada* Remand Order. This was a strategy to buy time and make money, while preventing Michigan from

27

enforcing its state law claims.  "An order remanding a removed case to state court 'may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.'" *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 134 (2005) (quoting 28 U.S.C. § 1447(c)).  As explained by the Supreme Court,

> [T]he standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. [*Id.* at 141 (citations omitted).]

Kalshi's removal was unreasonable because this case plainly does not arise under federal law and Kalshi is well aware of that fact.  *See* 28 U.S.C. § 1331.  Kalshi's first ground for removing the AG's purely state-law-based complaint is a federal preemption defense, and a long line of settled precedent establishes that a federal defense (including a federal preemption defense) is not a basis for removal.

Kalshi's assertion that the complete preemption doctrine converts the AG's state-law complaint into a federal complaint likewise lacks merit.  Kalshi does not identify any authority suggesting that the CEA is one of the few statutes with this extraordinary preemptive effect, nor does Kalshi provide any substantial reason to demonstrate how the doctrine's demanding requirements are met.  Kalshi must show a clear intent to displace all state causes of action, but it cannot do that because the statute on which it relies has a savings clause that specifically preserves state-court jurisdiction.  *See* 7 U.S.C. § 2(a)(1)(A).

Further, Kalshi must show that federal law provides a cause of action to address the unlawful conduct at issue here (violation of state gaming law), *see Roddy,*

395 F.3d at 323, and Kalshi identifies no such provision.  The only courts that have ever considered the argument have rejected Kalshi's position—including the federal courts in Massachusetts and Nevada.  *See Mass.* Remand Order and *Nevada* Remand Order.

Finally, Kalshi's claim that the CFTC was required to be joined as a defendant plainly lacks merit.  The AG is seeking to stop Kalshi from offering unlicensed betting in Michigan.  It is not seeking to enjoin the CFTC.  The CFTC may have a generalized interest in the outcome of this case, but it does not have a substantial interest that requires joinder, because adjudication of the AG's state-law claims against Kalshi will not decide any right, duty, or obligation of the CFTC.  Kalshi points to no authority that supports removal under these circumstances.

The AG accordingly requests that this Court award fees and costs under 28 U.S.C. § 1447(c).

29

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the AG requests that this Court remand this action to the state circuit court for Ingham County, Michigan, from whence it came, on the grounds that this Court lacks subject matter jurisdiction over this action, and award costs and actual expenses, including attorneys' fees, incurred as a result of the removal.

Respectfully submitted,

/s/ Lauren Fitzsimons
Lauren Fitzsimons (P82997)
Felepe H. Hall (P59533)
Jason A. Geissler (P69322)
Assistant Attorneys General
Attorneys for Plaintiff
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
fitzsimonl@michigan.gov
hallf2@michigan.gov
geisslerj@michigan.gov

Dated:  March 18, 2026

30

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word count limitation of W.D. Mich. L. Civ. R. 7.2 because, excluding the part of the document exempted by W.D. Mich. L. Civ. R. 7.2, this brief contains no more than 10,800 words.  This document contains 7,725 words.

2.      This word count was generated using Microsoft Word for Microsoft 365 MSO, version 2410.

Respectfully submitted,

/s/ Lauren Fitzsimons
Lauren Fitzsimons (P82997)
Felepe H. Hall (P59533)
Jason A. Geissler (P69322)
Assistant Attorneys General
Attorneys for Plaintiff
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
fitzsimonsl@michigan.gov
hallf2@michigan.gov
geisslerj@michigan.gov

Dated:  March 18, 2026

31

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2026, I electronically filed the above document(s)

with the Clerk of the Court using the ECF System, which will provide electronic

copies to counsel of record.

/s/ Lauren Fitzsimons

Lauren Fitzsimons (P82997)
Felepe H. Hall (P59533)
Jason A. Geissler (P69322)
Assistant Attorneys General
Attorneys for Plaintiff
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
fitzsimonsl@michigan.gov
hallf2@michigan.gov
geisslerj@michigan.gov
